9 U.S. 173
 5 Cranch 173
 3 L.Ed. 70
 KEMPE'S LESSEE
v.
KENNEDY ET AL.
 February Term, 1809
 
 1
 ERROR to the circuit court of the district of New-Jersey, in an action of ejectment brought by John Den, lessee of Grace Kempe, a British subject, against R. Kennedy and M. Cowell, citizens of the state of New-Jersey, for land in that state.
 
 
 2
 Upon the trial of the cause upon the general issue, a bill of exceptions was taken by the plaintiff, which presents the following case:
 
 
 3
 Grace Coxe, the lessor of the plaintiff, being seised in fee of the land in question, before the year 1772 intermarried with John Tabor Kempe, who died in August, 1792. They resided in New-York before and during the war with Great Britain, and vent to Great Britain when New-York was evacuated by the British army. Grace Kempe, since the death of her husband, has continued to reside, and now resides, in Great Britain, where he died; having been in possession of the land in right of his wife, on the first of March, 1776, and until the same was seized by the authority of the state of New-Jersey.
 
 
 4
 The defendants relied upon several acts of the legislature of New-Jersey; an inquisition taken under the authority of those acts; a judgment of the inferior court of common pleas for the county of Hunterdon, in May, 1779, upon that inquisition, confiscating the estate; a judgment of the inferior court of common pleas for the county of Sussex; an execution upon that judgment; and a deed from Joseph Gaston, an agent for the state of New-Jersey, to the defendant Kennedy, whose tenant the other defendant was; and proved, that he had always been in possession under that deed from the day of its date, to the day of trial.
 
 
 5
 Upon this case the plaintiff prayed the court to instruct the jury that they ought to find a verdict for him; which the court refused, and directed the jury that they ought to find a verdict for the defendants; to which refusal and direction the plaintiff excepted, and brought his writ of error.
 
 
 6
 R. Stockton, for plaintiff in error.
 
 
 7
 This case turns on the validity of the forfeiture and confiscation under the acts of the state of New-Jersey.
 
 
 8
 The great objection is, that Mrs. Kempe was not an object of those laws.
 
 
 9
 The whole question depends upon the act of the 11th of December, 1778, entitled 'An act for forfeiting to, and vesting in, the state of New-Jersey, the real estates of certain fugitives and offenders, and for directing the mode of determining and satisfying the lawful debts and demands which may be due from, or made against, such fugitives and offenders, and for other purposes therein mentioned;' by the 3d section of which it is enacted, 'that each and every, person, not an inhabitant of this state, but of some of the other United States, and seised or possessed of, interested in, or entitled unto, any estate, real or personal, within this state, who hath, since the 19th day of April, 1775, aided or assisted, or doth now, or hereafter may, aid or assist the enemies of this state, or of the United States, by joining their armies within this state, or elsewhere, or who already hath, or hereafter shall have, voluntarily gone to, taken refuge or continued with, or endeavoured to continue with, the enemy aforesaid, and aid them by counsel, or otherwise, shall be, and is hereby declared to be, guilty of high treason against this state; and on conviction thereof by inquisition found, and final judgment entered thereon in favour of the state, in manner herein after declared, such conviction shall amount to a full and absolute forfeiture of such offender's estate, both real and personal whatsoever, within this state, to and for the use of the same. Provided always, that such conviction shall not in any instance extend to affect the person of any such offender, but shall operate against his or her estate only.'
 
 
 10
 Mrs. Kempe does not come within any of the descriptions of offenders in this section.
 
 
 11
 The inquisition charges, that Kempe and wife are offenders against the act of 11th of December, 1778, in this, 'that the said John Tabor Kempe and Grace his wife, did go to the enemy, and took refuge with them some time in April, 1776, and still remain with them,' 'against the form of their allegiance to this state.'
 
 
 12
 The truth of the fact is, that they did not go to the enemy, but remained at their own homes, and the enemy came to them.
 
 
 13
 But take the fact as charged; she and her husband, i. e. she in company will her husband; and legally, by the command and control of her husband, in April, 1776, went to the British and remained with them.
 
 
 14
 This is a joint charge for a joint act of the husband and wife; and is in the technical language always used when the wife is charged with concurring in the act of the husband.
 
 
 15
 Here then is a feme covert charged under this section for accompanying her baron in April, 1776, before any government was established, before any law defining treason, and even before New-Jersey had formed her constitution, and before any prohibition of the act done by her. She simply remained with her husband, without affording any aid to the enemy.
 
 
 16
 Such a person is not within the purview of this section, and therefore, though the forfeiture perhaps operated on the interest of the husband, it did not reach the estate of the wife.
 
 
 17
 We contend,
 
 
 18
 1. That this section does not extend to femes covert acting with, and therefore by presumption of law under control of, their husbands.
 
 
 19
 And, 2. That if it did extend to any feme covert, yet it did not extend to one who only went and remained; she must have aided and assisted.
 
 
 20
 1. No feme covert is within the act. It is confined to those who voluntarily go and remain. It supposes a free will, a volition, an election to go or stay: but a feme covert in the presence of her baron, has no will; and on the subject of residence, she can have no will different from his. She is bound by law to live with him if he requires it. This would be the case at all times, even after the passing of these laws; for as freedom of will is of the essence of all crimes, a woman cannot commit a crime of this sort, not even this species of treason, by obeying her husband.
 
 
 21
 But when this fact was done there was neither government nor law to offend against. The only law which existed placed her under the dominion of her husband. He had the right to command, and the power to compel her to go and remain with him, and she had neither right to refuse, nor power to resist.
 
 
 22
 But if these laws had then existed, she could not be charged for any breach of them in company with her husband. 1 Hawk. 3. § 9. 1 Hale, 47. Receiving her husband, knowing him to be a traitor, is not treason.
 
 
 23
 The facts of her coverture, and going and remaining with her husband, appear upon the face of the inquisition itself, and clearly show that she could not have been an offender against the act, and therefore that her estate was not forfeited.
 
 
 24
 Nor can the legislature be presumed to have intended to include persons in her situation; for that would have been cruel. They did not mean to legislate against the most important duties of social and domestic life, to cut asunder the bands of matrimonial union, to compel a wife to abandon her husband or forfeit her estate.
 
 
 25
 Mrs. Kempe, not having the capacity voluntarily to commit the offence, was not an object of the law, and, consequently, the justice who took the inquisition had not jurisdiction as it regarded her. The inquisition itself does not charge the act to be done by her voluntarily; and this being essential to the offence, ought to have been directly charged. No implication is sufficient. 2 Hawk. 354. § 110. Penal laws are to be construed strictly, especially as to the description of the offender; and general words ought to be so restrained as not to include innocent persons if they can be otherwise satisfied.
 
 
 26
 The person who is the proper object of the act must be an inhabitant of some state other than New-Jersey. A feme covert cannot properly be called an inhabitant of a state. The husband is the inhabitant. By the constitution of New-Jersey, all inhabitants are entitled to vote; but it has never been supposed that a feme covert was a legal voter. Single women have been allowed to vote, because the law supposes them to have wills of their own.
 
 
 27
 The word 'her' in the last clause of the section may be satisfied by restricting its sense to single women.
 
 
 28
 If this act be not limited to those acting sui juris, it may as well comprehend infants at the breast as femes covert.
 
 
 29
 In the case of Martin v. The Commonwealth of Massachusetts, 1 Williams's Mass. Rep. 390. it was decided that a feme covert did not forfeit her lands by joining the enemy with her husband; and the reasoning of the judges in that case applies with equal force to this.
 
 
 30
 2. If the provisions of this act extend to any feme covert, yet they do not extend to one in the situation of Mrs. Kempt; for by the very words of the act, she must not only have 'voluntarily gone to, taken refuge, or continued with, or endeavoured to continue with, the enemy,' but she must also have 'aided them by counsel or otherwise.'
 
 
 31
 The inquisition does not find that she aided them in any manner. The species of treason intended to be described was that of adhering to the enemies of the country, giving them aid and comfort, as defined by the statute of Edw. III.
 
 
 32
 It is clear then that Mrs. Kempe was not an offender against that law, and consequently her estate not forfeitable under it.
 
 
 33
 But an important point still remains to be decided, viz. what is to be the consequence of this improper construction? are the proceedings merely erroneous, or are they void? are they good until reversed, or a nullity ab initio? If merely erroneous and good until reversed, the judgment of the circuit court must be affirmed. But if the proceedings are void ab initio, there has been no judgment, and, consequently, no forfeiture.
 
 
 34
 This point must be determined by the known principles of the common law. These were ingrafted into the constitution of New-Jersey, and have never been impaired by the legislature, so far as they apply to the ordinary administration of justice.
 
 
 35
 The tribunal erected to execute these laws was an inferior tribunal, proceeding, by force of particular statutes, out of the course of the common law; it was a jurisdiction limited by the statute, both as to the nature of the offence, and the description of persons over whom it should have cognisance. Every thing ought to have been stated in the proceedings which was necessary to give the court jurisdiction, and to justify the judgment of forfeiture. If the jurisdiction does not appear upon the face of the proceedings, the presumption of law is, that the court had not jurisdiction, and so the cause coram non judice. In which case no valid judgment could be rendered.
 
 
 36
 The proceedings were instituted before a justice of peace upon the information of certain commissioners. The justice issued his warrant to a constable to summon a jury, who take the inquest and return it to the justice, who returns it to the inferior court of common pleas, all of whom are to proceed according to certain forms prescribed by the statute. The inferior court of common pleas has no criminal jurisdiction but what is given by these very statutes relative to treason. And if the proceedings in this case do not show it to be a case within those statutes, the presumption of law is that the case was not within the cognisance of the court.
 
 
 37
 But the law itself is founded in manifest injustice. It is clearly ex post facto. It makes that act a crime which was innocent when committed; not only innocent when committed, but at that time there was neither constitution nor government to sin against.
 
 
 38
 There is no presumption in favour of the jurisdiction of a court of limited jurisdiction. 2 Wils. 382, 383. 6 Mod. 224. 9 Mod. 95.
 
 
 39
 This is a case of conviction under a penal statute; and there is, in point of principle, no difference between this and a conviction before a single magistrate. The cases on this subject fully apply. 4 Burr. 2279. Rex. v. Corden. 1 Burr. 148. 153. Rex v. Jarvis. 6 Term Rep. 583. 4 Burr. 2244. Cowp. 26. 29. 2 Wils. 382. 2 Inst. 231. 12 Mod. 355. 1 Lev. 160.
 
 
 40
 The 11th section of the act of December 11, 1778, will be relied on as barring the plaintiff's claim to the land, and compelling her to resort to the treasury for indemnification.
 
 
 41
 But that section both in words and spirit is applicable only to proceedings and judgments having legal entity and existence, not to proceedings void for want of jurisdiction. It speaks of proceedings by virtue of which any such sale shall be made. The sale referred to is a sale in pursuance of, and warranted by, the acts.
 
 
 42
 The words 'shall hereafter be reversed or made void,' refer to some measure afterwards to be resorted to, to accomplish the reversal of existing judgments or proceedings, for error, or irregularity. The term 'crroneous' being the appropriate word to describe errors apparent on the record, and 'void,' to describe irregularities. The case of Parsons v. Loyd, 3 Wils. 344. shows that irregular proceedings are called void proceedings. The legislature meant to encourage sales by protecting the purchaser in all cases where the offender was a proper object of the laws. It was foreseen that writs of error or certiorari might be brought to reverse those judgments; and that applications might be made to the courts of common pleas to vacate the proceedings for irregularities committed by the justice, or constable, or jury, or the court itself. It interposed this section, but it never meant to give sanction to a proceeding entirely coram non judice.
 
 
 43
 Lewis, contra.
 
 
 44
 The bill of exceptions prays the opinion of the court upon the whole case. Upon such a prayer the facts ought to be as fully stated as in a special verdict. It presents no question of law. It does not appear that Grace Kempe ever was seised in fee. But if she was, the estate was devested out of her, and vested in the state of New-Jersey.
 
 
 45
 The proceedings were all perfectly regular, and correspondent with the law.
 
 
 46
 But even if they were not, the 11th section of the law prevents such error from affecting the title of a bona fide purchaser. It declares 'That if any process or proceedings, by virtue of which any such sale may be made as aforesaid, shall hereafter be reversed, or made void, for error, or any other cause whatsoever, such reversal shall not affect, or injure, or be in force, or in any wise operate against any bona fide purchaser under this act, but against the state only; and in every such case the plaintiff in error, or person injured by the sale of any estate, shall apply to the legislature to be indemnified out of the public treasury, to the amount of the purchase-money received for such estate.'
 
 
 47
 The title under the sale is good even if the person whose lands were so condemned and sold were dead at the time of the judgment. Even an innocent third person, whose lands may have been condemned and sold, can never disturb the title of the purchaser; his only remedy is against the state by petition to the legislature.
 
 
 48
 If the judgment be erroneous, still it is valid until it is reversed; and if reversed, the only remedy is against the state.
 
 
 49
 It is objected, that the law is is ex post facto, and contrary to natural justice. Admit it to be so, yet there was nothing to prevent New-Jersey from passing such a law. She was sovereign and independent, and had the power to make what laws she pleased. There was nothing in her constitution to prevent it.
 
 
 50
 A wife may commit treason in company with he husband. The only exception in cases of treason is, that the wife is not guilty of treason in receiving her husband knowing him to be a traitor.
 
 
 51
 It is objected that a wife living with her husband cannot be an inhabitant; but there is nothing inconsistent in the idea. The husband and wife are both inhabitants; and it is evident that the legislature meant to include them, because they speak of 'his or her estate.' And the word 'her' comprehends femes covert as well as femes sole.
 
 
 52
 The inquisition does not state it to be a joint offence. If she would avail herself of the objections, she ought to have appeared and traversed the inquisition.
 
 
 53
 Martin's case, in Massachusetts, was a mere question of escheat. It was a civil case, and it was clear that no woman was comprehended within the terms of the law. The question altogether depended upon the words and intention of the statute of Massachusetts, and not at all upon the question whether a woman could commit treason in company with her husband.
 
 
 54
 The court of common pleas of New-Jersey is not limited as to subject matter in common pleas. It is a court of record, and a writ of error lies to its judgment. The cases respecting limited jurisdictions do not apply. It is true, that it has not a general criminal jurisdiction; but in these cases of confiscation it had an unlimited and exclusive jurisdiction. The legislature of New-Jersey had a right to alter the law which required that the jurisdiction should appear upon the face of the inquisition.
 
 
 55
 If the inquisition be upon a matter within their jurisdiction, it is unimportant whether the defence be defectively set forth.
 
 
 56
 The defect in setting forth the offence does not affect the jurisdiction of the court.
 
 
 57
 If the word 'voluntarily' ought to have been inserted in the inquisition, it is only error of judgment in the court, but it does not deprive the court of its jurisdiction.
 
 
 58
 Stockton, in reply.
 
 
 59
 There is no well founded objection to the bill of exceptions; the form of which is warranted, as well by the books as by the practice of New-Jersey. It contains the evidence on both sides, and the point of the charge of the court to the jury, which in such a case, is all that is necessary to bring the whole case fairly before this court.
 
 
 60
 The neglect of Mrs. Kempe to traverse the inquisition cannot injure her, if the court had no jurisdiction. A person not an object of that law was under no obligation to take notice of the proceeding.
 
 
 61
 The estates of third persons, whose lands by mistake were sold, were not forfeited, nor their rights affected. All the sections of the act, which create forfeitures, relate only to the estate of the offender.
 
 
 62
 The 11th section of the act applies only to cases in which the court having jurisdiction, has proceeded wrongfully, whereby their proceedings might be reverted for error, or declared void for irregularity; not to cases where the court, under colour of the law, proceeded against persons not within it.
 
 February 20.
 
 63
 MARSHALL, Ch. J. delivered the opinion of the court as follows:
 
 
 64
 In this case two points are made by the plaintiff in error.
 
 
 65
 1. That the judgment rendered by the court of common pleas, which is supposed to bar the plaintiff's title, is clearly erroneous.
 
 
 66
 2. That it is an absolute nullity, and is to be entirely disregarded in this suit.
 
 
 67
 However clear the opinion of the court may be, on the first point, in favour of the plaintiff, it will avail her nothing unless she succeeds upon the second. Without repeating, therefore, those arguments which have been so well urged at the bar, to show that the inquisition in this case did not warrant the judgment which was rendered on it, the court will proceed to inquire whether that judgment, while unreversed, does not bar the plaintiff's title.
 
 
 68
 The law respecting the proceedings of inferior courts, according to the sense of that term as employed in the English books, has been correctly laid down. The only question is, was the court, in which this judgment was rendered, 'an inferior court,' in that sense of the term?
 
 
 69
 All courts from which an appeal lies are inferior courts in relation to the appellate court before which their judgment may be carried; but they are not therefore inferior courts in the technical sense of those words. They apply to courts of a special and limited jurisdiction, which are erected on such principles that their judgments, taken alone, are entirely disregarded, and the proceedings must show their jurisdiction. The courts of the United States are all of limited jurisdiction, and their proceedings are erroneous, if the jurisdiction be not shown upon them. Judgments rendered in such cases may certainly be reversed, but this court is not prepared to say that they are absolute nullities, which may be totally disregarded.
 
 
 70
 In considering this question, therefore, the constitution and powers of the court, in which this judgment was rendered, must be inspected.
 
 
 71
 It is understood to be a court of record possessing, in civil cases, a general jurisdiction to any amount, with the exception of suits for real property.
 
 
 72
 In treason, its jurisdiction is over all who can commit the offence.
 
 
 73
 The act of the 4th of October, 1776, defines the crime, and that of the 20th of September, 1777, prescribes the punishment. The act of the 18th of April, 1778, describes the mode of trial, and the tribunal by which final judgment shall be rendered. That tribunal is the inferior court of common pleas in each county. Every case of treason, which could arise under the former statutes, is to be finally decided in this court. With respect to treason, then, it is a court of general jurisdiction, so far as respects the property of the accused.
 
 
 74
 The act of the 11th December, 1778, extends the crime of treason to acts not previously comprehended within the law, but makes no alteration in the tribunal before which this offence is to be tried, and by which final judgment is to be rendered.
 
 
 75
 This act cannot, it is conceived, be fairly construed to convert the court of common pleas into a court of limited jurisdiction, in cases of treason. It remains the only court capable of trying the offences described by the laws which have been mentioned, and it has jurisdiction over all offences committed under them.
 
 
 76
 In the particular case of Grace Kempe, the inquest is found in the form prescribed by law, and by persons authorized to find it. The court was constituted according to law; and, if an offence, punishable by the law, had been in fact committed, the accused was amenable to its jurisdiction, so far as respected her property in the state of New Jersey. The question whether this offence was or was not committed, that is, whether the inquest which is substituted for a verdict on an indictment, did or did not show that the offence had been committed, was a question which the court was competent to decide. The judgment it gave was erroneous, but it is a judgment, and, until reversed, cannot be disregarded.
 
 
 77
 This case differs from the case from third Institute in this. In that case the court was composed of special commissioners authorized to proceed, not in all cases of treason, but in those cases only in which an indictment had been taken before fifteen commissioners. Their error was not in rendering judgment against a person who was not proved by the indictment to have committed the crime, but who, if guilty, they had no power to try. The proceedings there were clearly coram non judice.
 
 
 78
 It is unnecessary to notice the eleventh section of the act, since, without resorting to it, this court is of opinion that there is no error in the judgment of the circuit court. It is affirmed, with costs.